**FOGGY BOTTOM ASSOCIATION,**
Petitioner,

v.

**DISTRICT OF COLUMBIA ZONING
COMMISSION, Respondent,**

and .

**The George Washington University,**
Intervenor.

No. 07–AA–1260.

District of Columbia Court of Appeals.

Argued April 3, 2009.
Decided Sept. 3, 2009.

Cornish F. Hitchcock, Washington, DC, for petitioner.

Mary T. Connelly, Assistant Attorney General, with whom Peter J. Nickles, Acting Attorney General for the District of Columbia at the time, Todd S. Kim, Solicitor General, and Donna M. Murasky, Deputy Solicitor General, were on the brief, for respondent.

Deborah B. Baum, with whom Maureen Dwyer, Alison B. Rousseau, and David Avitabile, Washington, DC, were on the brief, for intervenor.

Before FISHER, BLACKBURNE–RIGSBY, and THOMPSON, Associate Judges.

Fisher, Associate Judge:

The Foggy Bottom Association ("FBA"), a community organization comprised of property owners and residents of the Foggy Bottom area, asks us to review an order of the District of Columbia Zoning Commission ("Commission") which approved two applications submitted by the George Washington University ("GW," or "University") related to new development planned for its Foggy Bottom campus. FBA presents three challenges to the Commission's order, arguing that: (1) the Commission should have postponed its review until a comprehensive environmental impact study had been conducted; (2) the Commission erred in reviewing GW's new campus plan under the regulations governing both campus plans and planned unit developments ("PUDs"); and (3) there is not substantial evidence in the record to support the Commission's ruling on certain points. We affirm in part and remand in part.

## I. The Procedural Background

On February 16, 2006, GW submitted an application for approval of a new campus plan for its Foggy Bottom campus—the *Foggy Bottom Campus Plan: 2006–2025*.[1] GW simultaneously submitted an application for first-stage approval of a PUD and related Zoning Map amendments. GW asserts that the purpose of the new campus plan is to meet the needs of the University for new and modernized facilities and increased on-campus undergraduate housing. The first-stage PUD application proposed higher campus density, available only through PUD approval, to accomplish the goals of the plan. GW asserts that the two applications do not contemplate any growth in student, faculty, or staff populations, and that the eighteen sites identified for development[2] will be within the current campus boundaries.

FBA moved to postpone the case pending preparation of a comprehensive environmental review, but the Commission de-

1. Development of the Foggy Bottom campus was previously governed by *Foggy Bottom Campus Plan: Years 2000 through 2009.*

2. This number includes Square 54, the old GW Hospital site, and Square 80, the School Without Walls site, which GW plans to develop under separate PUD applications. An ap-

nied the motion and held a public hearing on the consolidated applications.[3] It heard testimony and received evidence from the parties as well as the Office of Planning ("OP"), the Historic Preservation Office, the Zoning Administrator, and the District of Columbia Department of Transportation. On March 12, 2007, the Commission approved both applications subject to several conditions intended to mitigate the impact of the development.

## II. An Environmental Impact Statement Was Not Required

FBA contends that the District of Columbia Environmental Policy Act ("DCE-PA") required the Commission to postpone consideration of GW's applications until the environmental impact of the proposed development had been reviewed. The DCEPA requires any party or agency that "proposes or approves a major action that is likely to have substantial negative impact on the environment" to prepare and file "a detailed EIS [Environmental Impact Statement] at least 60 days prior to implementation...." D.C.Code § 8–109.03(a) (2001).[4] "To determine if a project meets this threshold, applicants must complete a simple checklist called an 'Environmental Impact Screening Form' (EISF)." 10 DCMR § 616.2. "The applicant for a permit for a major action shall

---

peal related to Square 54 is currently before us, captioned *Foggy Bottom Association v. District of Columbia Zoning Comm'n*, No. 07–AA–1197.

**3.** In addition to FBA, Advisory Neighborhood Commission 2A and the West End Citizens Association were parties in the hearing before the Commission. FBA is the sole petitioner in this appeal.

**4.** D.C.Code § 8–109.03(a) (2001) provides in full:

Whenever the Mayor or a board, commission, authority, or person proposes or approves a major action that is likely to have substantial negative impact on the environment, if implemented, the Mayor, board, commission, authority, or person shall prepare or cause to be prepared, and transmit, in accordance with subsection (b) of this section, a detailed EIS at least 60 days prior to implementation of the proposed major action, unless the Mayor determines that the proposed major action has been or is subject to the functional equivalent of an EIS. The EIS shall be written in a concise manner. The EIS shall describe and, where appropriate, analyze:

(1) The goals and nature of the proposed major action and its environment;

(2) The relationship of the proposed major action to the goals of the adopted Comprehensive Plan, requirements as promulgated by the Zoning Commission, and any District or federal environmental standards;

(3) Any adverse environmental impact that cannot be avoided if the proposed major action is implemented;

(4) Alternatives to the proposed major action, including alternative locations and the adverse and beneficial effects of the alternatives;

(5) Any irreversible and irretrievable commitment of resources involved in the implementation of the proposed major action;

(6) Mitigation measures proposed to minimize any adverse environmental impact;

(7) The impact of the proposed major action on the use and conservation of energy resources, if applicable and significant;

(8) The cumulative impact of the major action when considered in conjunction with other proposed actions;

(9) The environmental effect of future expansion or action, if expansion or action is a reasonably foreseeable consequence of the initial major action and the future expansion or action will likely change the scope or nature of the initial major action or its environmental effects;

(10) Responses to comments provided by the Council, any affected Advisory Neighborhood Commission, and interested members of the public; and

(11) Any additional information that the Mayor or a board, commission, or authority determines to be helpful in assessing the environmental impact of any proposed major action and the suggested alternatives.

file an EISF ... with the lead agency for review and determination of whether an EIS is required." 20 DCMR § 7204.2; *see also* D.C.Code § 8–109.03(c) (2001) (describing the process for determining whether an EIS is required).

FBA asserted that GW's development plan is a "major action" that triggers the requirements of the DCEPA. The Commission rejected this position for two reasons: (1) approval of a campus plan and a first-stage PUD is not an "action" as defined by the statutory language (and it therefore could not be a "major" action); and (2) the statute requires the EIS to address the requirements imposed by the Commission, and this can only occur after the Commission issues its order.

■ Because the Commission has no particular expertise in applying the DCEPA, we owe no deference to its interpretation, and therefore examine the statute *de novo*.[5] As relevant here, the DCEPA defines an "action" as "a project or activity that involves the issuance of a lease, permit, license, certificate, other entitlement, or permission to act by an agency of the District government." D.C.Code § 8–109.02(1)(B) (2001). The Commission concluded that "[a]pproval of a campus plan and a first-stage PUD involves none of these things. Neither of these preliminary

approvals would permit the University to obtain a building permit." "Nor can it be said that these approvals are permissions or entitlements, unless the Commission were to adopt the interpretation that granting a right to file an application is the type of permission or entitlement the Council was concerned with when it enacted the DCEPA."[6] In addition, the approvals did not constitute "a 'major action' within the meaning of the DCEPA, because the actions being permitted—that is, the filing of a further-processing application or a second-stage PUD application— would not cost more than $1,000,000."[7]

■ We agree that the Commission's Order did not result in the issuance of any "lease, permit, license, certificate, other entitlement, or permission to act." D.C.Code § 8–109.02(1)(B). *See Concerned Citizens of Brentwood v. District of Columbia Bd. of Zoning Adjustment,* 634 A.2d 1234, 1241–42 (D.C.1993) (rejecting the argument that an EIS must be prepared before a proceeding in which the Commission decided whether a proposed use could occur as a matter of right). The decision did not allow GW to begin construction, but rather only set forth the conditions under which the Commission would allow GW to continue with the zon-

5. *See Washington Post v. District of Columbia Dep't of Employment Servs.,* 825 A.2d 296, 299 (D.C.2003) (no deference owed to agency's interpretation of Virginia law). *Cf. Citizens Against Rails–to–Trails v. Surface Transportation Bd.,* 347 U.S.App. D.C. 382, 388, 267 F.3d 1144, 1150 (2001) ("Because NEPA's [the National Environmental Policy Act's] mandate is addressed to all federal agencies, the Board's determination that NEPA is inapplicable to the Trails Act is not entitled to the deference that courts must accord to an agency's interpretation of its governing statute.").

6. In conducting our *de novo* review, we do not rely upon the fact, noted by the Commis-

sion, "that, while the word 'permission' appears in the definition of the term 'action,' it is not to be found in the actual substantive provision of the DCEPA that FBA relies upon." Moreover, it is clear from context that this observation by the Commission did not alter its ruling. In language quoted above, the Commission had already concluded that these approvals were not "permissions or entitlements."

7. With an exception not relevant here, a "major action" is defined as "any action that costs over $1,000,000 and that may have a significant impact on the environment...." D.C.Code § 8–109.02(2) (2001).

ing process. As the Commission explained, "each development project identified in the PUD will require approval through a second-stage PUD, including a detailed site plan review, to confirm compliance with the first-stage approval and the applicable provisions of § 210." Only after second-stage PUD approval is secured will GW be able to apply for and obtain building permits. *See* 11 DCMR §§ 2408.8, 2409.1.

██ This is a sensible interpretation of the statutory language. "Under the DCEPA, the environment can be harmed only if a proposed major action violates environmental standards *and* that major action is 'implemented'. . . . The key requirement, therefore, is that the EIS review occur before the major action is actually 'implemented,' . . . *i.e.*, before construction actually beg[ins]. . . ." *Foggy Bottom Ass'n v. District of Columbia Bd. of Zoning Adjustment,* 791 A.2d 64, 73 (D.C.2002) (emphasis in original).[8] As the statement of legislative purpose makes clear, the Council imposed "a requirement that the environmental impact of proposed District government and privately initiated actions be examined before implementation. . . ." D.C.Code § 8–109.01 (2001).

Moreover, the DCEPA requires that the conditions imposed by the Zoning Commission be evaluated in the EIS. *See* D.C.Code § 8–109.03(a)(2) (2001) ("The EIS shall describe and, where appropriate, analyze: . . . [t]he relationship of the proposed major action to the goals of the adopted Comprehensive Plan, requirements as promulgated by the Zoning Commission, and any District or federal environmental standards[.]"). The Commission properly recognized that "the DCEPA process cannot begin until after these requirements are determined, which, for these two applications, could not be known while the proceedings were ongoing."

FBA argues that delaying the EIS review until the building permit stage results in "piecemealing" the construction plans, and "fails to consider the cumulative impact of development proposals that would add significant new development to the Foggy Bottom/West End neighborhoods." It is not clear why FBA needs to invoke federal law,[9] because the DCEPA explicit-

---

8. Federal courts applying the National Environmental Policy Act have said that an EIS is not yet necessary where, as here, the party could not take any action that might harm the environment without seeking further approval from the government. *See Conner v. Burford,* 848 F.2d 1441, 1447–48 (9th Cir.1988) (oil and gas drilling companies were not required to prepare an EIS before being granted a lease containing a "no surface occupancy" provision, because the provision forbade the companies from disturbing the land until the Bureau of Land Management conducted an EIS review "includ[ing] consideration of the potential for further connected development and cumulative impacts from all oil and gas development activities. . . . We cannot assume that government agencies will not comply with their NEPA obligations in later stages of development."); *Sierra Club v. Federal Energy Regulatory Comm'n,* 754 F.2d 1506, 1509 (9th Cir.1985) ("Petitioner's argument [that

the agency should have required an EIS before granting a preliminary permit] rests on the mistaken belief that the permit alone allows the applicants to enter federal land and conduct feasibility tests which may disturb the environment. The sole purpose of the preliminary permit is to maintain the applicant's priority of application for a license.").

9. *See, e.g., Taxpayers Watchdog, Inc. v. Stanley,* 260 U.S.App. D.C. 334, 338, 819 F.2d 294, 298 (1987) ("The rule against segmentation was developed to ensure that interrelated projects the overall effect of which is environmentally significant, not be fractionalized into smaller, less significant actions."); *Sierra Club v. Marsh,* 769 F.2d 868, 881 (1st Cir. 1985) (agencies must take into consideration the impact of all the development that is "related logically or geographically.").

ly requires that an EIS analyze "[t]he cumulative impact of the major action when considered in conjunction with other proposed actions[.]" D.C.Code § 8–109.03(a)(8) (2001).

But even if we were to borrow the piecemealing concept (and we do not here decide whether that is appropriate), that doctrine addresses how comprehensive an environmental review must be; it does not dictate *when* such a review must take place. The answer to that question is set forth in the DCEPA, which, as we have demonstrated, requires an EIS to be prepared "at least 60 days prior to implementation" of "a major action that is likely to have substantial negative impact on the environment, if implemented...." D.C.Code § 8–109.03(a) (2001). The Zoning Commission did not err by declining to postpone consideration of GW's applications until an environmental review had been conducted.

### III. May a Campus Be a PUD?

FBA next contends that the Commission erred by considering and applying the PUD regulations "rather than confining itself to the campus plan regulations...." It argues that there are significant structural and policy differences between the campus plan regulations, 11 DCMR § 210 (2003),[10] and the PUD regulations, 11 DCMR §§ 2400–2499, and that, by considering both in conjunction, the Commission wrongly permitted an increase in building density on the Foggy Bottom campus. FBA contends that this approach violates not only the campus plan regulations, but also the PUD regulations, which state that "the PUD process shall not be used to circumvent the intent and purposes of the Zoning Regulations...." 11 DCMR § 2400.4.

"[T]he Zoning Commission is the exclusive agency vested with power to enact zoning regulations for the District of Columbia." *Spring Valley Wesley Heights Citizens Ass'n v. District of Columbia Bd. of Zoning Adjustment,* 644 A.2d 434, 436 (D.C.1994); *see* D.C.Code § 6–621.01(e) (2001) ("The Zoning Commission shall exercise all the powers and perform all the duties with respect to zoning in the District as provided by law."); *id.,* § 6–641.01 (describing regulatory powers of the Zoning Commission); *id.,* § 6–641.03 ("The Zoning Commission may from time to time amend the [zoning] regulations or any of them or the maps or any of them."). "We will defer to the agency's interpretation of the statute and regulations it administers unless its interpretation is unreasonable or in contravention of the language or legislative history of the statute and/or regulations." *Watergate East Comm. Against Hotel Conversion to Co–op Apartments v. District of Columbia Zoning Comm'n,* 953 A.2d 1036, 1043 (D.C.2008) (quoting *Cathedral Park Condo. Comm. v. District of Columbia Zoning Comm'n,* 743 A.2d 1231, 1239 (D.C.2000)). "When the construction of an administrative regulation rather than a statute is in issue, deference is even more clearly in order." *1330 Connecticut Ave., Inc. v. District of Columbia Zoning Comm'n,* 669 A.2d 708, 714–15 (D.C.1995) (quoting *Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965)). We need not find that the Commission's construction is "the only reasonable one, or even that it is the result we would have reached had the question arisen in the first instance in judicial proceedings." *Colbert v. District of Columbia Dep't of Employment Servs.,* 933 A.2d 817, 819–20 (D.C. 2007). In other words, "[w]e will not lightly overturn the [Commission]'s decision."

---

10. Unless otherwise noted, we will cite to the 2003 edition of the Zoning Regulations— those in effect when this matter was before the Commission.

*Smith v. District of Columbia Bd. of Zoning Adjustment*, 342 A.2d 356, 360 (D.C. 1975).

GW's Foggy Bottom campus is an area of approximately forty-three acres in Northwest Washington that contains residential (R–5–D and R–5–E), commercial (C–3–C), and special purpose (SP–2) zoning.[11] Colleges and universities are permitted as a matter of right in commercially zoned districts, 11 DCMR §§ 701.6(f), 721.1, 741.1, but the Commission must grant special exception approval to allow such use in residential and special purpose districts. 11 DCMR §§ 210.1, 507.1. In order to obtain this approval, a college or university must submit "a plan for developing the campus as a whole," which includes "the location, height, and bulk, where appropriate, of all present and proposed improvements...." 11 DCMR § 210.4. *See The President & Directors of Georgetown College v. District of Columbia Bd. of Zoning Adjustment,* 837 A.2d 58, 66, 69–70 (D.C.2003); *Glenbrook Road Ass'n v. District of Columbia Bd. of Zoning Adjustment,* 605 A.2d 22, 32 (D.C. 1992) (both opinions discussing the historical context for zoning laws governing campus plans). The new campus plan submitted by GW pursuant to section 210 contemplates development through the two-stage PUD process.

 "The PUD scheme is to be used as a tool of land use development which supports the objectives of the community by permitting the development of large areas as a unit." *Watergate East,* 953 A.2d at 1040 (quoting *Dupont Circle Citizens Ass'n v. District of Columbia Zoning Comm'n,* 426 A.2d 327, 332 (D.C.1981)). The PUD process allows "flexibility of development and other incentives, such as increased building height and density; provided, that the project offers a commendable number or quality of public benefits and that it protects and advances the public health, safety, welfare, and convenience." 11 DCMR § 2400.2. In the first stage, the Commission reviews "the site's suitability for use as a PUD; the appropriateness, character, scale, mixture of uses, and design of the uses proposed; and the compatibility of the proposed development with citywide, ward, and area plans of the District of Columbia, and the other goals of the PUD process." 11 DCMR § 2402.2(a). "The second stage is a detailed site plan review to determine compliance with the intent and purposes of the PUD process, the first stage approval, and [the Zoning Regulations]." 11 DCMR § 2402.2(b).

As part of its PUD application, GW requested rezoning of specific inner-campus properties from R–5–D (residential) to C–3–C (commercial) in order to concentrate density towards the center of campus, away from surrounding residential areas. When approving GW's campus plan in conjunction with the proposed PUD, the Commission also acknowledged that the floor area ratio (FAR) limit [12] for portions of the

11. R–5–D zoning is for medium to high density residential districts; R–5–E zoning is for high density residential districts; C–3–C zoning is for high density commercial districts that serve as major business and employment centers; and SP–2 zoning is for medium to high density special purpose districts containing apartments and office spaces. *See* 11 DCMR § 105.1(a)-(d).

12. Floor area ratio ("FAR") limitations provide a means of controlling building density. FAR is "a figure that expresses the total gross floor area as a multiple of the area of the lot. This figure is determined by dividing the gross floor area of all buildings on a lot by the area of that lot." 11 DCMR § 199.1. For R–5–D and R–5–E districts, the type of residential districts at issue here, the default regulations limit the maximum FAR to 3.5 and 6.0 respectively, 11 DCMR § 402.4. For R–5–D

campus zoned as residential would be increased. The FAR would now be prescribed by the PUD regulations, thus allowing greater density than would be available under section 210.[13]

FBA asserts that by looking outside the campus plan regulations, the Commission allowed the PUD regulations to "trump" the "fixed criteria" in section 210, which is intended to "prevent unreasonable campus expansion into improved low-density districts." 11 DCMR § 210.3. The Commission specifically rejected this argument, explaining that "[t]he Zoning Regulations do not prohibit use of the PUD process in conjunction with the campus plan process, provided that the PUD process is not used to circumvent the intent and purposes of the Zoning Regulations, including § 210, or to result in action that is inconsistent with the Comprehensive Plan." *See* 11 DCMR § 2400.4.

▮ We have found nothing in the Zoning Regulations that prohibits the use of PUDs in conjunction with campus plans. By contrast, there currently are eleven provisions of the Zoning Regulations that impose express limitations on the degree of flexibility that can be permitted through the use of PUDs in certain districts,[14] demonstrating that the Commission knows how to restrict PUDs when it chooses to do so. Tellingly, as the Commission noted, section 210 is "silent on the matter." Furthermore, we have found no provision that differentiates residential districts containing a campus (if special exception approval has been granted) from other residential districts in terms of PUD applicability. All residential districts, including those in which a special exception use has been approved, are subject to default FAR limitations, yet are also amenable to the PUD process.[15] Although section 210 limits

and R–5–E districts within campus plans, "the maximum bulk requirements normally applicable in the districts may be increased for specific buildings or structures; provided, that the total bulk of all buildings and structures on the campus shall not exceed the gross floor area prescribed for the R–5–D District." 11 DCMR § 210.3. In other words, within residential districts, section 210 allows a college or university to spread out its allowable density as it sees fit, so long as the aggregated campus-wide bulk does not exceed a prescribed limit. *See Draude v. Bd. of Zoning Adjustment*, 527 A.2d 1242, 1246–48 (D.C. 1987). For GW, that limit is the "[FAR] prescribed for the R–5–D District." 11 DCMR § 210.3.

**13.** The Commission explained:
Under § 210.3, the FAR of the residentially-zoned areas of a campus is aggregated to a total based on the allowable FAR in the district, not to a specific number (e.g., 3.5). In this case, the R–5–D District that comprises most of the campus has a maximum matter-of-right density of 3.5 FAR, with a maximum density of 4.5 FAR achievable through the PUD process. Pursuant to § 210.3, the density limit is the "gross floor area prescribed by the R–5–D district," and

the use of the PUD process is not proscribed to increase the allowable density within an approved campus plan.
*See* 11 DCMR §§ 402.4, 2405.2. The Commission went on to find that "[t]he increased density will not violate § 210 ... because the proposed density for the residentially-zoned portions of the campus will be 3.69 FAR, less than the density of 4.5 FAR permitted under a PUD in the R–5–D zone." *See id.*

**14.** *See, e.g.,* 11 DCMR § 1503.1 ("In the [Dupont Circle] Overlay District the matter-of-right height and floor area ratio limits shall serve as the maximum permitted height and floor area ratio for a planned unit development."); 11 DCMR § 1402.2 ("For the purposes of [the Reed–Cooke Overlay District] chapter, no Planned Unit Development shall exceed the matter-of-right height, bulk, and area requirements of the underlying district."). Eight sections in the 2003 Zoning Regulations contain restrictions on PUDs in specific districts; three similar sections have since been added to Title 11 as addenda.

**15.** *See* 11 DCMR § 402.4 (setting the maximum permitted FAR in each residential district); 11 DCMR § 2405.2 (setting the maxi-

FAR on an aggregated campus-wide basis, as opposed to more typical default regulations which limit the FAR of each structure within a district, *see* 11 DCMR § 402.4, nothing in section 210 suggests that this somehow renders the PUD regulations inapplicable.[16] In sum, FBA simply has not demonstrated that the Commission's interpretation of its own regulations "is unreasonable or in contravention of [their] language or legislative history...." *Watergate East*, 953 A.2d at 1043.

Nevertheless, FBA asks rhetorically "[i]f the PUD process can be invoked to override inconvenient parts of the campus plan regulations, what purpose is served by having the Section 210 campus plan process on the books?" One response is to point out that PUDs are not available simply for the asking. The applicant must persuade the Commission that the project offers a sufficient number or quality of public benefits to justify the flexibility requested. 11 DCMR §§ 2400.2, 2403.2. Moreover, the Commission did not ignore the campus plan regulations, but found that GW had carried its burden of proof for special exception approval under section 210 as well as its burden of proof for first-stage PUD approval under chapter 24.[17] The Commission did not contravene the "intent and purposes of the Zoning Regulations" by concluding that both sets of zoning regulations could be used in conjunction.[18]

## IV. FBA's Substantial Evidence Claims

 FBA argues that certain of the Commission's decisions are not supported by substantial evidence. We generally defer to the Commission when it is making factual determinations and applying its own regulations. *Dupont Circle Citizens Ass'n v. District of Columbia Zoning Comm'n*, 431 A.2d 560, 569 (D.C.1981) (upholding a PUD approval because the Commission had "consider[ed] all the material issues raised by petitioner, and [ ] its findings are supported by substantial evidence."). "Our function is not to determine whether a particular zoning action is, or is not, desirable." *Watergate East*, 953 A.2d at 1042 (internal quotation marks and citation omitted). We will address each of FBA's contentions separately.

### A. The Specifics and Enforceability of the Amenities Package

Initially, FBA challenges the Commission's decision that the amenities offered by GW justify the increased development

mum permitted FAR in districts within a PUD project area, thereby allowing increased FAR limitations in residential districts developed through the PUD process).

16. Indeed, the Commission stated that to disallow PUDs in conjunction with campus plans would be to "impose a disparate standard" that "serves no legitimate purpose."

17. FBA also argues that the regulations' distinct standards are incompatible, pointing to the section 210 requirement that development "shall be located so that it is not likely to become objectionable to neighboring property because of noise, traffic, number of students, or other objectionable conditions," 11 DCMR § 210.2, and the PUD regulations which al-

low approval so long as the impact is not "unacceptable," but "either favorable, capable of being mitigated, or acceptable given the quality of public benefits...." 11 DCMR § 2403.3. Contrary to FBA's argument, we do not consider the regulations to be irreconcilable-both require a balancing of interests. As previously stated, the Commission explicitly found that *both* standards were satisfied.

18. In fact, the Commission concluded that "[t]he two processes are complementary.... The two-stage PUD process mirrors the two-stage campus plan process, in which individual projects are subject to approval after the initial approval of a campus plan that deals with large concepts and the location of uses and densities."

allowed under a PUD. The PUD regulations, 11 DCMR §§ 2400–2499, are "designed to encourage high quality developments that provide public benefits." 11 DCMR § 2400.1. As we have already explained, "[t]he overall goal is to permit flexibility of development and other incentives, such as increased building height and density; provided, that the project offers a commendable number or quality of public benefits and that it protects and advances the public health, safety, welfare, and convenience." 11 DCMR § 2400.2. In determining whether to grant a PUD application, the Commission "shall judge, balance, and reconcile the relative value of the project amenities and public benefits offered, the degree of development incentives requested, and any potential adverse effects according to the specific circumstances of the case." 11 DCMR § 2403.8.

■ In its Order, the Commission required GW to provide certain amenities to the community as a condition of the Commission's approval of the first-stage PUD application. These amenities included a pledge that GW would: file applications with the Historic Preservation Review Board ("HPRB") to designate certain buildings as historic landmarks, pursue approval from the District Department of Transportation ("DDOT") of the proposed Streetscape Plan for the neighborhood, maintain certain resources as part of the Streetscape Plan, and create an I Street retail corridor. Petitioner complains that because "there is doubt as to the feasibility of certain amenities or the effectiveness of conditions designed to mitigate adverse effects, [ ] the balance struck by the Commission in approving a PUD [comes] undone." Specifically, petitioner argues that the proffered amenities are not sufficiently feasible and the conditions imposed are not realistically enforceable because they require the approval and participation of oth-

er parties besides GW (namely, the Historic Preservation Review Board, the DDOT, and individual retailers), and the decisions of these entities are outside the control of GW and the Commission.

■ "As a court of review, we must acknowledge that this question [of how to weigh and balance the evidence related to amenities and benefits] is better answered by the Zoning Commission which has the expertise to make such a broad justification based on elements of fact, policy, and experience." *Dupont Circle Citizens Ass'n*, 426 A.2d at 332. The Commission recognized that the conditions challenged by FBA "contemplate actions to be taken by persons and entities other than the Applicant ... [and that] Applicant cannot be held responsible for the action or inaction of third parties...." Consequently, "compliance with such conditions shall be determined based upon whether the University has undertaken good faith efforts to comply with the condition in question." What the Commission anticipated is that GW would file all the necessary paperwork and follow through the process of implementing these amenities; achieving a favorable result was not a stated requirement. GW has the obligation to comply with these conditions in "good faith," or risk denial of its second-stage PUD application.

The record demonstrates that the proffer of amenities is not just the product of wishful thinking. David Maloney, who was then Deputy Director of the Historic Preservation Office, testified that while GW would "prepare the materials necessary to submit an application for the historic district," he believed that the application would actually come from his office "since the university is not the owner of all the property within the historic district." Evidencing its intent to carry out its obligations, GW amended the preservation

condition during the course of the hearing to include a provision that GW and the Office of Planning would "file the appropriate applications . . . within sixty (60) days . . . [of] the issuance of a final order from the Zoning Commission . . . and the expiration of any appeal period. . . ."

GW also participated in two hearings before the HPRB, at which it presented slides demonstrating its vision for the neighborhood. Chairman Boasberg of the HPRB commented that he believed GW was "proceeding in exactly the right direction," and another member of the board, Ms. Henderson, observed that GW's "campus plan, that actually includes an historic preservation plan is good for the university, good for the community, and good for the city." Although the HPRB had some questions about technical aspects of the plan, the record shows that it generally approved the plan and intended to cooperate with GW in solidifying the details.

Although FBA also questions the feasibility of the Streetscape Plan, there is evidence that GW had already made progress on securing agency cooperation for its proposal. GW represented that the university was currently working with DDOT on implementing the plan. GW's representatives also testified that GW intended to create a retail corridor on I Street, to serve both the interests of the community, which "wanted more retail, more possibility [ ] to go out to dinner in the neighborhood or even a supermarket and shopping," and the interests of the university itself in "attract[ing] students and faculty to the university [and] hav[ing] [a] traditional town center." As GW has pointed out in its brief, if it chooses not to implement the development that is approved in this PUD, "the University would derive no benefit from the PUD and there would be no impact on the community from a development plan that is never implemented." Although it is theoretically possible, as FBA posits, that the "proposed I Street retail corridor [will] fail[ ] to attract merchants," it is in GW's best interest to bring retail into the neighborhood, and the Commission was justified in crediting its commitment and ability to do so.[19]

 The record contains substantial evidence to support the Commission's decision that the amenities offered by GW outweigh the potential drawbacks of more concentrated development in the Foggy Bottom area. The testimony offered by

---

19. FBA heavily relies on *Committee of 100 on the Federal City v. District of Columbia Dep't of Consumer & Regulatory Affairs*, 571 A.2d 195 (D.C.1990), where we remanded the agency's order approving a demolition project because it "fail[ed] to address material issues relating to the feasibility of the proposed amenities. . . ." *Id.* at 198. That case concerned the proposed demolition of an historic building, and was governed by the Preservation Act, which required that "a proposed amenity meet a high standard in order to qualify as a 'special merit' project." *Id.* at 200. We do not find *Committee of 100* to be instructive, and it certainly is not controlling, in this situation. Not only did it concern a statute that required the proponent to justify the offered amenities by a much higher standard than that required in connection with a PUD, *compare* D.C.Code § 6–1102(11) (2001) (requiring that the project provide "significant benefits to the District of Columbia . . . by virtue of exemplary architecture, specific features of land planning, or social or other benefits having a high priority for community services"), *with* 11 DCMR § 2400.2 (requiring only that the proposed project offer "a commendable number or quality of public benefits"), but neither the petitioner nor the agency in that case provided a sufficiently detailed explanation in the record to satisfy the stringent requirements of the Preservation Act. In contrast, GW testified about the amenities with sufficient detail to satisfy the requirements of a first-stage PUD application, and the Commission made express findings related to each amenity.

various government agencies demonstrates ongoing cooperation between GW and the District of Columbia for the purpose of improving the Foggy Bottom neighborhood. Ultimately, FBA questions the Commission's judgment that the amenities outweigh the impact of increased development. However, "[i]f there is substantial evidence to support the Commission's finding, then the mere existence of substantial evidence contrary to that finding does not allow this court to substitute its judgment for that of the Commission." *Watergate East*, 953 A.2d at 1043 (internal quotation marks and editing omitted).

### B. GW's Method of Counting Students

One of the more contentious issues during the hearings was the method of calculating the number of students using the Foggy Bottom campus, for the purpose of enforcing limits. Both FBA and GW presented testimony regarding the impact of the student population on the Foggy Bottom neighborhood, and they proposed different methods of calculating that impact. The University proposed a "primary relationship" test, which would, in general, count all students who either live or take classes on the Foggy Bottom campus, but exclude those students who either reside or take all their classes at GW's satellite campus, Mount Vernon.[20] FBA advocated an "intensity of use" test, whereby all students using the Foggy Bottom campus would be included, regardless of whether they were also counted in a different campus's plan. The Commission adopted GW's "primary relationship" test without much analysis, stating only that "the proposed campus plan will not tend to create conditions objectionable to neighboring property because of the number of stu-

dents[, because] [t]he new campus plan will maintain the maximum headcount and full-time equivalent student populations permitted under the current campus plan[.]"

In support of its methodology, FBA presented evidence that all students present on the Foggy Bottom campus contribute to noise, traffic, and other unfavorable conditions. It also submitted a report by the Zoning Administrator, who advised that "all students physically present in the neighborhood by attending courses at the Foggy Bottom campus should be counted." The Commission did not address FBA's argument that all students coming to the Foggy Bottom campus add to the strain on the neighborhood, and therefore should be counted in the campus plan, regardless of whether those students are also accounted for in the Mount Vernon plan.

■ "[T]he function of the court in reviewing administrative action is to assure that the agency has given full and reasoned consideration to all material facts and issues. The court can only perform this function when the agency discloses the basis of its order by an articulation with reasonable clarity of its reasons for the decision. There must be a demonstration of a rational connection between the facts found and the choice made." *Dietrich v. District of Columbia Bd. of Zoning Adjustment*, 293 A.2d 470, 473 (D.C.1972) (internal citation and quotation marks omitted). *See also Blagden Alley Ass'n v. District of Columbia Zoning Comm'n*, 590 A.2d 139, 147 (D.C.1991) (Because "[a] simple conclusory statement without explanation is insufficient[,]" we remanded the Commission's order to the agency to "explain how the rezoning required by this P.U.D. application is not inconsistent with

---

**20.** GW also maintains a separate campus in Loudoun County, Virginia. These students are not counted in the District of Columbia campus plans.

the Comprehensive Plan *as a whole*.") (emphasis in original).

 Here, the Commission was presented with testimony that the sheer number of students on campus, including those who live at Mount Vernon but take classes at Foggy Bottom, contributes to overcrowding problems on the Foggy Bottom campus. The Commission neither discredited this testimony nor addressed FBA's concerns. The Commission's statement that the headcount method was appropriate because it "will maintain the maximum headcount ... permitted under the current campus plan" does not specifically address FBA's argument, and the Zoning Administrator's testimony, that this method does not accurately measure the impact of students on the community. Because the Commission did not demonstrate a rational connection between its findings of fact and its conclusion, we remand to give the Commission the opportunity to articulate its reasoning.

### C. GW's Method of Counting Faculty and Staff

FBA also disagrees with the Commission's decision approving GW's request to "merge[ ] the separate faculty and staff headcounts from the 2000 campus plan into one combined category." Although the combined ceiling remains the same, FBA maintains that the new method of counting increases the number of faculty and staff permitted, because staff who also teach a class will not be "double-counted" in both categories, as theoretically could have happened before. Furthermore, argues FBA, the Commission "did not factor in the possibility that GW[ ] could 'outsource' work now performed by GW[ ] employees to private employers ... [because] the definition of 'faculty and staff' explicitly excludes private contractors." FBA warns that this loophole allows GW to circumvent the limit of the Order by replacing large numbers of its faculty and staff with independently contracted workers.

 We reject FBA's arguments. GW's representative testified that the university had, under the old method, made efforts to prevent double-counting of staff and faculty members; FBA presented no evidence to the contrary. Unifying the two headcounts therefore should not increase the total number of faculty and staff from that permitted under the old campus plan. Furthermore, GW's proposal to combine the staff and faculty headcounts was supported by both the Office of Planning and the Zoning Administrator, who wrote, "[b]ased on the difficulty in defining a line between faculty and staff, it is recommended that the counts be combined as proposed by GW. In terms of impacts on the community, there does not appear to be a difference in the two groups." Finally, FBA's fear that GW will circumvent the cap on faculty and staff by outsourcing its work to independent contractors has no support in the record. FBA presented no evidence that GW has previously employed large numbers of independent contractors, or that it intends to do so in the future. The perceived threat from outsourcing is completely speculative, and the Commission was not required to discuss it. *See Capital Hilton Hotel v. District of Columbia Dep't of Employment Servs.*, 565 A.2d 981, 991 n. 18 (D.C.1989) (The "issue, we conclude, although contested below, ultimately was not a material one on which the examiner was compelled to make a finding."); *Lee v. District of Columbia Zoning Comm'n*, 411 A.2d 635, 638 (D.C.1980) ("an issue is not necessarily 'material' simply because evidence was presented on the point at the hearing").

## D. Substantial Compliance with the Student Headcount Limits

Drawing upon language from the previous campus plan, the Commission's Order provided that "[n]o second-stage PUD application filed by the University pursuant to this first-stage approval shall be granted unless the University is in substantial compliance with" the conditions described. Moreover, "[a]ny violation of the following Conditions furnish grounds for the denial of any building permit or certificate of occupancy applied for by the University for any University building or use, and may result in the imposition of fines and penalties pursuant to the Department of Consumer and Regulatory Affairs Civil Infractions Act of 1985...." The Commission explained that "[t]he first sentence, new Condition P–17, governs the Commission's own processes and continues the past Plan's requirement that the University demonstrate 'substantial compliance' with identified conditions as a prerequisite to obtaining approval of an application under this Order." "The second sentence, new Condition C-[3], is addressed to the Zoning Administrator, and authorizes, but does not require, the denial or revocation of permits issued under this Order if the University violates one or more of the identified conditions."

FBA argues that "[t]hese provisions offer inadequate protections to the community." It faults the Commission for failing "to provide content to [its] decision to permit only 'substantial compliance' with the [student] headcount limits" and asserts that "an agency cannot make a finding that the 'number of students' is unlikely to become objectionable if the agency does not specify exactly how many students it is permitting." Moreover, "with no guidance from the Commission, it is not clear what the Zoning Administrator would view as being something less than 'substantial compliance.'"

■ We are not persuaded. "Substantial compliance" is a familiar term in administrative law generally and zoning law in particular. Indeed, that term has been used in other campus plans. *See Spring Valley–Wesley Heights Citizens Ass'n v. District of Columbia Zoning Comm'n*, 856 A.2d 1174, 1179 (D.C.2004) (quoting from campus plan for American University: "No special exception application filed by the University for further processing under this plan may be granted unless the University proves that it has consistently remained in substantial compliance with Conditions 1 through 16 set forth in this Order."); *The President & Directors of Georgetown College v. District of Columbia Bd. of Zoning Adjustment*, 837 A.2d 58, 85 (D.C.2003) (quoting from conditions imposed on campus plan: "No special exception application filed by the University for further processing under this plan may be granted unless the University proves that it has consistently remained in substantial compliance with Conditions 1 through 18 set forth in this Order."); BZA Order No. 16553 at 18 (George Washington University); Zoning Commission Order No. 949, Case No. 00–36CP/16638 (July 19, 2001) at 39 (American University). The phrase also appears in zoning regulations. *See* 11 DCMR § 1001.4 ("substantial compliance with District of Columbia and federal regulations ... shall be required"); 11 DCMR § 1002.8 ("The Board of Zoning Adjustment shall make the final determination as to substantial compliance with D.C. Law 2–144 and the federal regulations governing historic preservation."). *See also Wheeler v. District of Columbia Bd. of Zoning Adjustment*, 395 A.2d 85, 90 (D.C.1978) (defining "substantial compliance" in procedural context).

It is important to recognize that the term "substantial compliance" appears in Condition P–17, which, the Commission explained, governs its own processes. Thus, "the responsibility for [interpreting the phrase 'substantial compliance'] rests exclusively with this Commission." [21] The language in Condition C–3, addressed to the Zoning Administrator, applies to "any violation" of the referenced conditions. As the Zoning Commission explained, "[s]ince Condition C-[3] leaves it to the discretion of the Zoning Administrator when enforcement action is appropriate, he or she will not be required to deny or revoke permits issued under this Order if the University violates one or more of the identified conditions." *Cf. Spring Valley–Wesley Heights Citizens Ass'n*, 856 A.2d at 1180 (concluding "that it was entirely reasonable for the Commission to state a general condition [related to parking] and to leave 'the details and mechanics' of its enforcement to the University"). And, because the Zoning Administrator will not be required to enforce Condition P–17, he or she will not be responsible for interpreting the phrase "substantial compliance." [22]

FBA obviously disagrees with the decision to accept "substantial compliance" with the limits on student population, rather than demand strict adherence, but the Commission adequately articulated its reasoning, and we are not prepared to say

that this aspect of its decision is "[a]rbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." D.C.Code § 2–510(a)(3)(A) (2001).

## V. Conclusion

We remand for further proceedings with respect to the method of counting students. In all other respects, the order of the Zoning Commission under review is hereby affirmed.

*So ordered.*

---

**21.** In justifying its use of the term, the Commission pointed out that it had "successfully applied the 'substantial compliance' standard under the current plan in *Application by George Washington University for Further Processing of an Approved Campus Plan Under § 210 to Modify Conditions of Approval of the Lerner Health & Wellness Center at 2301 G Street, N.W. (Square 42, Lot 847)*, Zoning Commission Order 02–26, 51 DCR 11931 (2004)."

**22.** Additionally, FBA argues that because the key remedy for being out of compliance will be "the denial of any building permit or certificate of occupancy applied for by the Uni-

versity for any University building or use[,] ... GW[] can be out of compliance [for substantial periods of time], so long as it comes into compliance by the time any application is approved." FBA has provided no evidence that such flouting of the rules is likely to occur. Furthermore, "[t]he University has ample incentive to implement [this condition properly], for the University remains subject to continuing oversight by the Commission and will face the prospect of serious consequences if it fails to fulfill its obligations." *Spring Valley–Wesley Heights Citizens Ass'n*, 856 A.2d at 1179.