Paul RENEAU, Petitioner,

v.

DISTRICT OF COLUMBIA, et al., Respondents,

and

Dupont Circle Conservancy, Inc., Intervenor.

No. 93–AA–820.

District of Columbia Court of Appeals.

Argued April 24, 1996.
Decided May 30, 1996.

---

5. We reject, finally, appellant McClinton's argument that the evidence was insufficient to support his conviction.

Richard W. Luchs, Washington, D.C., with whom Jacques B. DePuy was on the brief, for petitioner.

Charles F.C. Ruff, Corporation Counsel, and Charles L. Reischel, Deputy Corporation Counsel, filed a statement in lieu of brief for respondents.

Richard A. Friedman, for intervenor.

Before TERRY, STEADMAN and REID, Associate Judges.

REID, Associate Judge.

Petitioner Paul Reneau petitions from a decision of the Mayor's Agent under the Historic Landmark and Historic District Protection Act, denying his request for a permit to put a fourth floor rooftop addition on his property as well as a third floor rear deck. He contends that (1) the Agent's decision was arbitrary and capricious and was not based on substantial evidence; (2) the Agent erred in failing to explain why he rejected Mr. Reneau's expert testimony; and (3) the Agent committed error in interpreting the Historic Landmark statute. We affirm.

## FACTUAL SUMMARY

In November 1990, petitioner Paul Reneau and his wife purchased a three story townhouse located at 1312 21st Street, N.W. When the cost of remodeling the townhouse for their own personal use became prohibitive, they decided to convert it into condominium units. Mr. Reneau hired an architect and contractor to do the required work. The architect and contractor obtained some but not all of the required permits for the renovation.

In May 1991, construction began on a fourth floor addition to the townhouse. However, around August 14, 1991, the District of Columbia issued a stop work order because there had been no historical preservation or zoning review, and because no permit had been issued for the exterior work on the building, including the fourth floor addition. The stop work order continued until April 21, 1992, when it was lifted.

Eventually, Mr. Reneau obtained the proper zoning review, and initiated the process for review by the Historic Preservation Review Board (HPRB). Two applications were presented to the HPRB: (1) No. 92–104 concerning modification to the attic and roof, decks, first floor conservatory, fire escape, etc.; and (2) No. 92–369 regarding modification of the rooftop loft, as recommended in the HPRB staff report, dated February 1992, and the addition of a third floor rear deck. In February 1992, the HPRB staff made recommendations with respect to application No. 92–104. They recommended a redesign of the fourth floor addition to avoid its visibility and intrusion on the roofline "as perceived from the front facade." The staff also recommended elimination of the skylights, the metal chimney flues and the top deck. However, the staff found other rear decks and additions to be "consistent with the purposes of the law and with other approved additions and decks in the Dupont Circle Historic District." During the HPRB's February 19, 1992, hearing, a representative of Advisory Neighborhood Commission (ANC) 2–B (Dupont Circle) informed the HPRB of an unanimous ANC 2–B vote, asking the Board to:

Rule that any alterations visible from either 21st Street or Newport Place, Northwest, including the fourth floor addition, the flues, all skylight windows, and all decks are inappropriate and incompatible, and any new construction which does not conform to this should be removed. . . .

After hearing other testimony and discussing the matter, the HPRB approved the staff report, and asked Mr. Reneau to submit accurate drawings to it for review.

The HPRB met again on March 18, 1992. The staff reported on its review of Mr. Reneau's new drawings. They concluded, *inter alia*, that:

Although the applicant has increased the slant of the roof slope which will undoubtedly result in reduced visibility, he has not sufficiently stepped back the rooftop addition, nor has he provided the photos or drawings to support his case. . . . [and he has failed to demonstrate that the revised plan] sufficiently mitigates the visibility and intrusiveness of the current addition.

The staff recommended that "more documentation be made available." When one Board member inquired why the hearing had proceeded if the staff had not received all the requested documentation, Mr. Reneau's new architect discussed new drawings and proposals to eliminate part of the rooftop addition, including the metal chimney flues, skylight, and rear deck, and to change the slope of part of the top roof. After hearing from others and discussing the matter, the HPRB approved a motion to reject application No. 92–104, which included the rooftop alterations.

In April 1992, Mr. Reneau filed his new application, No. 92–369, which in part concerned a modification of the rooftop loft instead of its complete removal. The HPRB staff commented as follows:

The Staff does not object to the installation of another deck. However, the record of the Review Board is clear as regards the rooftop. The Board has stated the application should be denied and that the addition should be removed.

At the beginning of its July 15, 1992, meeting, a staff member announced that Mr. Reneau's application had changed since the staff issued its report. The staff member stated:

The applicant has asked to withdraw his application to leave a partial roof addition on the top. He is totally withdrawing that part of the application, and is only applying for a rear deck. The staff report, the last part of the staff report, recommends that the Review Board find that the additional deck at the rear of the home is consistent with other decks approved in this historic district.

Mr. Reneau spoke in behalf of the third floor deck. ANC 2–B sent a letter opposing the third floor deck on the ground that it "would be visible from public space, especially Newport Place, Northwest." The HPRB voted to deny the application for a third floor deck. On July 28, 1992, the HPRB sent official notification to Mr. Reneau that applications 92–104 (rooftop addition as built) and 92–369 (proposed rear deck) were not approved because the "projects [are] not consistent with the purposes of D.C. Law 2–144."

Mr. Reneau took the issues of the rooftop addition and the third floor deck to the Mayor's Agent, and requested a public hearing. The public hearing occurred on September 28, 1992; the Dupont Circle Conservancy[1] was granted party status. Two persons testified in Mr. Reneau's behalf: Gerald Kreidler of Kreidler Architects and Anne Adams, an architectural historian. The Mayor's Agent did not qualify Mr. Kreidler as an expert, but concluded that he was "experienced in historic preservation." Mr. Kreidler said that the structure, as then proposed by Mr. Reneau, was not inconsistent with the architecture and character of the street on which the townhouse was located. Ms. Adams showed a number of photographs of historically preserved edifices in the surrounding and other geographical areas of the District. She concluded:

We believe that what is proposed in its altered form to be consistent with what the Staff has recommended is consistent with the purposes of the Act. . . . [I]t is com-

---

1. The Dupont Circle Conservancy is composed of Dupont Circle citizens who are interested and active in historic preservation, especially in the Dupont Circle Historic District.

patible with the building and historic district.

Testifying for the HPRB was Hollie Saiz,[2] a staff coordinator of the Dupont Circle ANC who read a statement from ANC Commissioner Pam Taylor; the statement supported the decision of the HPRB. One other witness, Raymond Compton, a former D.C. school teacher and operator of an historic bed and breakfast in Frederick, Maryland, testified in support of Mr. Reneau's application and the HPRB recommendations for modification. Richard Friedman, a board member of the Dupont Circle Conservancy, spoke in opposition to Mr. Reneau's application. He insisted that the Mayor's Agent could only consider the plans that were before the HPRB, not new plans which Mr. Reneau had presented to the Mayor's Agent. Although Mr. Friedman is not an architect, he expressed the view that the plans considered by the HPRB were inconsistent with the character of the historic district. Jacqueline Prior, Executive Director of the D.C. Preservation League, made a statement in behalf of the League. She expressed concern about the integrity of the Historic Landmark statute and "concern ... that illegal work does not remain and go on for so long that it becomes acceptable."

## THE DECISION OF THE MAYOR'S AGENT

On June 1, 1993, the Mayor's Agent filed findings of fact and conclusions of law; denied the requested permit; and dismissed Mr. Reneau's application with prejudice. The findings reflect the facts set forth above. Moreover, with respect to his conclusions of law, the Mayor's Agent determined that no permit could be issued unless he found that such issuance is "necessary in the public interest," and that "necessary in the public interest" means, in part, "consistent with the purposes of the Act, as set forth in [D.C.Code] § 5–1001(b)(1) (1994 Repl.)." D.C.Code § 5–1001(b) provides in pertinent part:

(b) It is further declared that the purposes of this subchapter are:

(1) With respect to properties in historic districts:

(A) To retain and enhance those properties which contribute to the character of the historic district and to encourage their adaptation for current use;

(B) To assure that alterations of existing structures are compatible with the character of the historic district. . . .

The Mayor's Agent's major conclusions are contained in the following paragraphs:

46. There is no question that the street vista standing in front of an historic building is important. However, there is nothing in the Act to limit the compatibility test to that sole spot. Rather the Act clearly states that the test is "compatible with the character of the *historic* district." D.C.Code § 5–1001(b).

47. Therefore the test of compatibility must be measured not just from the view immediately in front of a structure but from the entire historic district.

48. However it should be noted that the character in some neighborhoods may be effected by a change in visibility from directly across the front facades. But the neighbors of this community, as well as presumably the majority of most Historic neighborhoods, are concerned about their views from all streets.

49. Thus, as with any proposed changes in views from any street and angles, the Applicant has the burden to demonstrate that his proposed changes are compatible with the historic character of the neighborhood where the change is being proposed. In this case, the Applicant has the burden of demonstrating that the additions, i.e., the fourth floor or the third floor deck, are compatible with all the vistas it effects.

50. To support his case, the Applicant has submitted photographs of additions that are visible from vistas within the Dupont Circle Historic District. The reality that some additions are visible has nothing to do with the compatibility of the additions at issue.[3] Rather, the issue is the impact

---

2. The spelling of Ms. Saiz' name also appears in the record as "Seiss."

3. "Each addition must be viewed within its own vista. The Record is devoid of when these visible additions were built thereby also leaving open

of the additions being proposed on the vistas being effected and there is no question that the effect on those vistas is not positive.

51. Furthermore, the issue of compatibility is just part of the two prong test. The second part requires the Applicant to show that the proposed changes are necessary to "encourage their adaptation for use." The Applicant has failed to show that such changes were at all necessary to encourage the adaptation of the structure for current use.

54. The Applicant has failed to meet his burden of proof that his project is consistent with the purposes of the Act.

The Mayor's Agent denied the permit and dismissed the application with prejudice.

## ANALYSIS

Mr. Reneau contends that the Mayor's Agent's decision "is arbitrary, capricious and an abuse of discretion, and is unsupported by substantial evidence in the record." Furthermore, he argues that the Mayor's Agent committed error "by failing to indicate any reason for rejecting the uncontradicted expert testimony offered on behalf of [Mr. Reneau]." Finally, he insists that the Mayor's Agent's interpretation of D.C.Code §§ 5–1002(10) [4] and 5–1001(b) is error as a matter of law. We disagree.

### Standard of Review

■ Our review of this matter is limited and narrow. "We must uphold the Mayor's Agent's decision if the findings of fact are supported by substantial evidence in the record considered as a whole and the conclusions of law flow rationally from these findings." *Kalorama Heights Ltd. Partnership v. District of Columbia Dep't. of Consumer & Regulatory Affairs,* 655 A.2d 865, 868 (D.C. 1995) (citing D.C.Code § 1–1510(a)(3)(E) (1992 Repl.), and *District of Columbia Preservation League v. Dep't. of Consumer & Regulatory Affairs,* 646 A.2d 984, 989 (D.C.

1994) (other citations omitted)). "Moreover, when ... the Mayor's Agent's [ ] decision is based on an 'interpretation of the statute and regulations it administers, that interpretation will be sustained unless shown to be unreasonable or in contravention of the language of the legislative history of the statute.'" *Kalorama Heights,* 655 A.2d at 868 (quoting *Nova University v. Educational Inst. Licensure Comm'n,* 483 A.2d 1172, 1190 (D.C. 1984), *cert. denied,* 470 U.S. 1054, 105 S.Ct. 1759, 84 L.Ed.2d 822 (1985)). Furthermore, "[i]n making the necessary findings, a Mayor's Agent is 'not required to explain why [he or she] favored one witness' testimony over another, or one statistic over another." *Id.* at 868–69 (quoting *Don't Tear It Down, Inc. v. Dep't of Housing and Community Dev.,* 428 A.2d 369, 378 (D.C.1981)). We have also said, however, that " 'some indication of the reason for rejecting expert, as opposed to lay, testimony is required.'" *Committee For Washington's Riverfront Parks v. Thompson,* 451 A.2d 1177, 1193 (D.C.1982) (quoting *Bakers Local Union No. 118 v. District of Columbia Board of Zoning Adjustment,* 437 A.2d 176, 179 n. 6 (D.C.1981)).

## I.

■ We conclude that the Mayor's Agent's decision was neither arbitrary nor capricious, but was supported by substantial evidence in the record. Although the decision is not a model of clarity, a close reading reveals that it contains a cogent analysis of the record evidence, flows rationally from the findings of fact, and contains no erroneous interpretations of law. We have said that "where we can sift the findings from the restatement of evidence and still have findings on the material contested issues, we will not set the findings aside." *Id.* at 1193 (quoting *Don't Tear It Down, Inc., supra,* 428 A.2d at 379).

Here the Mayor's Agent made factual findings regarding visibility, compatibility, and the consistency of Mr. Reneau's design with

the question of whether some of these additions were added before the area was granted Historic District status." (This footnote appears as footnote 8 in the Mayor's Agent's decision.)

**4.** D.C.Code § 5–1002(10) reads:

"Necessary in the public interest" means consistent with the purposes of this subchapter as set forth in § 5–1001(b) or necessary to allow the construction of a project of special merit.

the purposes of the Historic Landmark and Historic District Protection Act of 1978, commonly known as the Historic Preservation Act. These findings were based on record evidence, including HPRB staff reports, designs and drawings submitted by Mr. Reneau, photographs allowed into evidence, proceedings before the HPRB, and testimony presented at the September 28, 1992, hearing before the Mayor's Agent. Clearly, the Mayor's Agent's decision was supported by substantial record evidence. There was no requirement that he write a perfect or model analytical opinion.

## II.

▮▮ Mr. Reneau also contends that the Mayor's Agent erred because he failed to state why he "[rejected] the uncontradicted expert testimony offered [on his behalf]." Mr. Reneau sought to qualify two expert witnesses—Mr. Kreidler and Ms. Adams. Only one, Ms. Adams, was qualified as an expert; her expertise was in architectural history. Mr. Reneau's basic complaint regarding his "experts" is that the Mayor's Agent failed to state why he rejected their testimony. In *Committee For Washington's Riverfront Parks, supra,* we pointed to the "well established" principle that "an agency which has made otherwise proper findings and reached rational conclusions [is not required] 'to explain ... why it favored one witness or one statistic over another.'" 451 A.2d at 1193 (quoting *Citizens Ass'n. of Georgetown, v. District of Columbia Zoning Comm'n,* 402 A.2d 36, 47 (D.C.1979)). Hence, the Mayor's Agent had no obligation to explain why he accepted other testimony over that of Mr. Kreidler, who was not qualified as an expert. Nevertheless, he was required to give "'some indication of the reason for rejecting [Ms. Adams' testimony], as opposed to lay, testimony'" since she was qualified as an expert. *Committee For Washington's Riverfront Parks,* 451 A.2d at 1193. The Mayor's Agent provided that indication in paragraph 50 of his decision and the accompanying footnote, as set forth above. Although Ms. Adams presented numerous photographs, she failed to indicate which of the additions reflected had been added before the area gained historic district status.

In addition, her narrative testimony accompanying the showing of the photographs did not focus on the impact of the proposed additions on the vistas being "effected" in the area.

## III.

▮▮ Finally, Mr. Reneau contends that the Mayor's Agent erroneously interpreted D.C.Code §§ 5–1002(10) and 5–1001(b). Mr. Reneau takes issue with paragraph 51 of the Mayor's Agent's decision:

> Furthermore, the issue of compatibility is just part of the two prong test. The second part requires the Applicant to show that the proposed changes are necessary to "encourage their adaptation for use." The Applicant has failed to show that such changes were at all necessary to encourage the adaptation of the structure for current use.

D.C.Code § 5–1001(b)(1)(A) states in part that one of the purposes of the Act is "to encourage their [i.e., properties in historic districts] adaptation for current use." The word "necessary" does not appear in the statute before the words "to encourage." Hence, Mr. Reneau insists that the Mayor's Agent committed error as a matter of law.

A reading of the Mayor's Agent's total conclusions of law reveals no grounds for setting aside his decision. The Mayor's Agent determined that the proposed alterations, to be approved, had to be "compatible with the character of the historic district." This requirement was discussed in detail in the decision. In paragraphs 46 through 50, the Mayor's Agent concluded that Mr. Reneau did not meet this test. As paragraph 49 of the decision points out, Mr. Reneau had "the burden of demonstrating that the additions, i.e., the fourth floor or the third floor deck, are compatible with all the vistas it effects." The compatibility test was not met because "the effect [of the additions] on those vistas [within the Dupont Circle Historic District] is not positive." This means, as the Mayor's Agent concluded in paragraph 54, that Mr. Reneau "failed to meet his burden of proof that his project is consistent with the purposes of the Act."

Since Mr. Reneau did not meet the requirement of compatibility in § 1–5001(b)(1)(B), the Mayor's Agent may not have been obliged to proceed to consider the further purposes set forth in § 1005(b)(1)(A). However, he in essence indicated in paragraph 51 of his decision that Mr. Reneau presented no evidence as to why issuance of the permit for his proposed additions was necessary in the public interest, even to encourage adaptation of his property for current use.[5] In doing so, he combined a discussion of two different but related statutory provisions—§ 5–1001(b)(1)(A), as set forth above, and § 5–1005(f), which provides that "No permit shall be issued unless the Mayor finds that such issuance is necessary in the public interest or that a failure to issue a permit will result in unreasonable economic hardship to the owner." We cannot say that the Mayor's Agent's application of the statute was unreasonable in the circumstances here.

## IV.

In summary, the factual findings here are supported by substantial record evidence and are binding on us even if we "may have reached a different result based on an independent review of the record." *Williamson*

*v. Board of Dentistry*, 647 A.2d 389, 394 (D.C.1994) (citing *Washington Post Co. v. District Unemployment Compensation Bd.*, 377 A.2d 436, 439 (D.C.1977)). The Mayor's Agent's conclusions of law "flow rationally from [his] findings and comport with the applicable law." *Id.* Moreover, to the extent that he was required to do so, the Mayor's Agent provided some indication of why he did not accept the conclusions of the "experts" offered by Mr. Reneau. Furthermore, his interpretation of the historic landmarks statute is reasonable. Finally, we have consistently recognized that "[w]e must be particularly deferential to the agency's determination where the decision lies within the agency's expertise." *Id.* (citing *Barry v. Wilson*, 448 A.2d 244, 246 (D.C.1982)).

Accordingly, we affirm the decision of the Mayor's agent.

*Affirmed.*

---

**5.** The suggestion that an applicant for an alteration must show that the proposed alteration is "necessary" in order to "encourage [a property's] adaptation for current use," literally read, may be infelicitous, but we read the word as simply a recognition that, as pointed out in the next sentence, the applicant here had not shown that the proposed changes were "at all necessary" (that is, in any way necessary) to effectuate the purpose of subsection (A), insofar as they might bear upon the lack of compatibility already found in the proposed alteration.