## WISCONSIN–NEWARK NEIGHBORHOOD COALITION, et al., Petitioners,

v.

## DISTRICT OF COLUMBIA ZONING COMMISSION, Respondent,

### Friendship–Macomb SC, Inc., Intervenor.

No. 09–AA–1092.

District of Columbia Court of Appeals.

Argued March 8, 2011.

Decided Dec. 22, 2011.

Dominic F. Perella for petitioners, with whom Jonathan L. Abram, Washington, DC, was on the brief.

Holly M. Johnson, Assistant Attorney General, with whom Irvin V. Nathan, Attorney General for the District of Columbia, and Donna M. Murasky, Deputy Solicitor General, were on the brief for respondent.

Phil T. Feola, with whom Leonard H. Freiman and David M. Avitabile, Washington, DC, were on the brief, for intervenor.

Before BLACKBURNE–RIGSBY, Associate Judge, and PRYOR and REID, Senior Judges.*

REID, Senior Judge:

Petitioners, Wisconsin–Newark Neighborhood Coalition, the Ordway Street Neighbors Association, and 3300 Idaho Neighbors, challenge a July 13, 2009 order issued by the District of Columbia Zoning Commission ("Commission"), which approved a Planned Unit Development ("PUD") and related Zoning Map amendment application submitted by Intervenor Friendship–Macomb SC, Inc. ("Giant") for a project on property that Giant owns. The project encompasses a 178,236 square foot area bounded by Wisconsin Avenue, N.W. and Idaho Avenue, N.W., and fronting Macomb Street, N.W. Petitioners argue that the Commission erred in (1) failing to refer the project to the Board of Zoning Adjustment ("BZA" or "Board"); (2) failing to enforce the Macomb–Wisconsin Neighborhood Commercial Overlay District's ("MW Overlay") height and density restrictions to the project; (3) approving a project that allegedly conflicted with the Comprehensive Plan for the District of Columbia; and (4) concluding that there

---

* Judge Reid was an Associate Judge of the court at the time of argument. Her status changed to Senior Judge on December 12, 2011.

was substantial evidence supporting Giant's claim that its truck-loading plan was feasible. We disagree and affirm the Commission's order.

## FACTUAL SUMMARY

On May 16, 2008, Giant submitted an application to the Commission for a PUD and related Zoning Map amendment for the project at issue. On July 21, 2008, Giant supplemented its application with revised plans and drawings depicting, among other changes, a relocated entrance to the grocery loading area and improvements of the building design. Giant proposed replacing its "existing shopping center with a mixed-use development featuring a new grocery store and new residential and commercial uses." The relevant property would be divided into two parcels—the "North Parcel" and the "South Parcel." The project is comprised of the following components:

On the North Parcel, [Giant] will construct a new five-story building containing ground-level retail uses and approximately 124 residential units above. On the South Parcel, [Giant] will construct the new grocery store, wrapped by a

pair of two-story mixed-use buildings. Along Wisconsin Avenue, [Giant] will construct ground-floor retail space with a second story devoted to commercial "flex" space with neighborhood-oriented retail and office uses. Along Newark Street, [Giant] will construct ground-floor retail space with 14 residential units above. Also on the South Parcel, along Idaho Avenue, [Giant] will construct eight three-story townhouses.[1]

As part of its application, Giant sought flexibility in complying with the various height and density restrictions applicable to the property to enable the buildings to reach their proposed height and density. Currently, the property is located in MW/C-1 and R-5-A Zone Districts.[2] The maximum height allowed in the MW/C-1 Zone District is 40 feet and three stories, and the maximum density is 1.0 Floor Area Ratio ("FAR"). 11 DCMR §§ 770.1, 771.2 (2008).[3] The maximum height permitted in the R-5-A Zone District is 40 feet, and the maximum density is 0.9 FAR. 11 DCMR §§ 400.1, 402.4, 402.6. Thus, Giant requested a PUD-related Zoning Map amendment for the North Parcel and a change, in a portion of the South Parcel, to the C-2-A Zone District to allow the

---

1. With respect to loading activity, the project is comprised of the following areas:
   The North Parcel will contain a loading area located off Idaho Avenue with two loading berths. The primary South Parcel loading area will be located off Idaho Avenue and will contain four loading berths to accommodate grocery deliveries. The loading entrance will be located approximately 140 feet from the southern property line, and the angled entrance of the loading area will require trucks to enter from and exit to the north on Idaho Avenue, away from the residential neighborhood to the south. The loading area was designed to permit trucks to pull in front-first and at grade, turn around on [Giant's] property, and back into an internal, completely enclosed loading berth. The secondary South Parcel loading area will contain a loading berth for retail deliveries. This berth will be accessed off Macomb Street via a 20-foot-wide public alley and will contain space to permit a truck to pull in front-first and then back into the loading area. On rebuttal, [Giant] agreed to construct a connection between the two loading areas on the South Parcel.

2. Approximately 83,603 square feet of land area on the South Parcel is currently zoned MW/C-1, and approximately 53,493 square feet of land area is zoned R-5-A.

3. Under the zoning regulations, FAR is defined as "a figure that expresses the total gross floor area as a multiple of the area of the lot. This figure is determined by dividing the gross floor area of all buildings on a lot by the area of that lot." 11 DCMR § 199.1.

construction of the project and to redevelop the neighborhood shopping center.[4] The maximum building height permitted in the C–2–A Zone District under the PUD guidelines is 65 feet, and the maximum density permitted is 3.0 FAR. 11 DCMR §§ 2405.1, 2405.2. The maximum height permitted in the R–5–A Zone District under the PUD guidelines is 60 feet, and the maximum density permitted is 1.0 FAR. 11 DCMR §§ 2405.1, 2405.2. The maximum blended density of C–2–A and R–5–A Zone Districts under PUD guidelines is 2.72 FAR. In conjunction with these more relaxed height and density standards afforded through the rezoning under PUD guidelines, Giant requested approval to construct multiple buildings to a maximum height of approximately 61 feet and density of 1.99 FAR.

In addition, as part of its proposed Zoning Map amendment, Giant included a request for approval to remove the MW Overlay for purposes of the PUD, so as to permit the mix of uses and densities needed for a vibrant urban neighborhood center. Existing zoning restrictions imposed under the MW Overlay limit the number of linear feet devoted to eating establishments.[5] Thus, without the Zoning Map amendment to remove the MW Overlay, the PUD would not be permitted to devote additional ground-floor commercial space to additional restaurants, prepared food shops, and fast food establishments.[6]

The Commission considered the PUD and related Zoning Map amendment pursuant to Chapters 24 (PUD Procedures) and 30 (Zoning Commission Procedures) of the District of Columbia Zoning Regulations, Title 11 of the District of Columbia Municipal Regulations ("DCMR"), following a public hearing held on February 19, April 6, April 23, May 4, and May 20, 2009. Included in the Commission's thirty-two page comprehensive order were findings of fact and conclusions of law supporting its decision to approve the PUD application and related Zoning Map amendment. As an initial matter, the Commission rejected Petitioners' argument that it was required to refer the project to the BZA for review and approval as a special exception to the MW Overlay, thereby precluding it from reviewing, as part of a PUD proceeding, a Zoning Map amendment that would remove the overlay designation. To the contrary, the Commission concluded that, under the PUD regulations, it had "the authority to rezone the Property to C–2–A and remove the MW Overlay for the purposes of the PUD through a PUD-related amendment to the Zoning Map." The Commission credited the testimony of the D.C. Office of Planning ("OP"), that "the MW Overlay will still exist on the Property, but is conditionally removed by the PUD only if the Applicant complies with the terms and conditions of the PUD Order." Once it had "approved the PUD-related [Z]oning [M]ap amendment that would result in the provisions of the [MW] Overlay no longer being applied to the property," the Com-

---

4. Approximately 111,720 square feet of the South Parcel is proposed to be rezoned as C–2–A, with approximately 25,388 square feet of land remaining in the R–5–A Zone District.

5. Because the MW Overlay is a Neighborhood Commercial ("NC") Overlay District, "[r]estaurants, fast food establishments, and prepared food shops" cannot "occupy ... more than twenty-five percent (25%) of the linear street frontage within a particular NC Overlay District, as measured along the lots that face designated roadways in the particular district...." 11 DCMR § 1302.5(a).

6. Giant also sought flexibility from the lot occupancy, roof structure, parking, loading, and lot control regulations, along with special exception approval for rowhouses in the R–5–A Zone District.

mission determined that it "need not consider whether the BZA should review the project under [11 DCMR] § 1308.3 of that Overlay." The Commission further explained that even if the MW Overlay provisions had remained during the pendency of the case, it would have retained authority to review the proposed project through the PUD process. It cited 11 DCMR § 2405.7[7] and stated that with respect to PUDs, it has the authority "to approve any use that is permitted as a special exception and that would otherwise require the approval of the [BZA]." Furthermore, it cited 11 DCMR § 2405.8 and stated that BZA approval is not required for any use approved by the Commission under 11 DCMR § 2405.7, and thus the Commission is not required to apply the special exception standards normally applied by the BZA.[8]

After determining that it had the authority to assess the project in a consolidated manner without referring it to the BZA for review, the Commission addressed the merits of the PUD application. The Commission found that the PUD would provide several public benefits, including the addition of 138 multi-family units and eight townhomes, ten percent of which would be set aside as affordable housing, improved pedestrian features, efficient and safe vehicular and pedestrian access, a new 56,000–square foot supermarket and 80,000 square feet of new neighborhood-serving retail and commercial space, thirty parking spaces during off-peak hours for patrons of the neighbor-

hood restaurants and retail uses, new traffic signals, construction using a high environmental standard under the Leadership in Energy and Environmental Design ("LEED")-Neighborhood Development ("ND") system, and employment and training opportunities for the District.

The Commission also assessed the traffic impact of the proposed project. The Commission agreed with the independent determination of the District of Columbia Department of Transportation ("DDOT") that traffic calming mitigation was not likely needed as a result of the PUD. Furthermore, the Commission credited the testimony of Giant's architectural and transportation experts and found that the project "will not generate unacceptable impacts due to truck traffic or loading activity" because Idaho Avenue can accommodate two-way traffic, including trucks, and such use of local streets for truck deliveries is not uncommon in such an urban setting. The Commission specifically rejected the opinion of 3300 Idaho Neighbors' traffic expert, who challenged Giant's truck generation rate and ability of the proposed number of loading berths to accommodate truck deliveries.

Pursuant to 11 DCMR § 2403.8, pertaining to PUD evaluation standards, the Commission concluded that Giant had satisfied its burden of proof regarding the requested flexibility from zoning regulations and complied with PUD standards and guidelines. Specifically, the Commission found that "the development incen-

7. The Commission cited 11 DCMR § 2407.5 in its order (relating to "yards" and "courts"), but the context of the discussion and the language quoted from 11 DCMR § 2405.7 makes it clear that this was a typographical error.

8. Initially, the Commission submitted a statement in lieu of its brief, asserting that it would not file a brief in this appeal, but

would instead stand behind Giant's brief. Following oral argument, this court issued an order requesting supplemental briefing from the Commission on whether it was required to refer this case to the BZA, or whether the Commission reasonably interpreted its authority to hear the case under both the MW Overlay regulations, 11 DCMR § 1308, and the PUD regulations, 11 DCMR § 2405.

tives for the proposed height, density, flexibility, and related rezoning to C–2–A are appropriate and are fully justified by the superior benefits and amenities offered by the Project."

The Commission stated in its findings that the proposed Zoning Map amendment to the C–2–A Zone District was "not inconsistent with the Comprehensive Plan or the character of the surrounding area" because the proposed zoning was located "at a neighborhood commercial center" and "is necessary to permit the mix and density of uses appropriate for transit- and pedestrian-oriented development...." The Commission also found that "removal of the MW Overlay designation for the purposes of the PUD is not inconsistent with the Comprehensive Plan or the character of the surrounding area" because "[t]he proposed PUD will further many of the objectives of the MW Overlay," and the "greater height and linear footage than would be permitted for eating establishments under the MW Overlay is appropriate given the limited impact of the height and uses as well as the numerous benefits and amenities of the PUD." In addition, the Commission found that "the PUD and Map Amendment are not inconsistent with the [Future Land Use Map of the] Comprehensive Plan's designation of the site in the Low–Density Commercial and Low–Density Residential land use categories or as a Neighborhood Commercial Center...." Noting that the Plan "does not require ... that each block strictly correspond with the general description" of the designated category, the Commission found that the Low–Density Commercial category permits housing in the commercial land use category "and permits height and density beyond the typical range of one to three stories through the use of the PUD process." The Commission further noted that "[t]he proposed C–2–A zoning of the PUD is not inconsistent with the

2006 Comprehensive Plan's Future Land Use Map designation, given the language in the Plan and description of the C–2–A Zone District in the Regulations as intended to serve 'low and medium density residential areas.'" Accordingly, the Commission granted the PUD and related Zoning Map amendment application. This appeal followed.

## ANALYSIS

■■■ "Our review of this matter is limited and narrow." *Hotel Tabard Inn v. District of Columbia Dep't of Consumer & Regulatory Affairs,* 747 A.2d 1168, 1173 (D.C.2000) (quoting *Reneau v. District of Columbia,* 676 A.2d 913, 917 (D.C.1996)); *see also Foggy Bottom Ass'n v. District of Columbia Zoning Comm'n,* 639 A.2d 578, 582 (D.C.1994). "'We must uphold the Mayor's Agent's decision if the findings of fact are supported by substantial evidence in the record considered as a whole and the conclusions of law flow rationally from these findings.'" *Hotel Tabard Inn, supra,* 747 A.2d at 1174 (quoting *Reneau, supra,* 676 A.2d at 917) (internal quotation marks and other citations omitted). "Furthermore, 'upon review of an order of the Commission, the court does not reassess the merits of the decision, but rather must determine whether findings supporting the decision are arbitrary, capricious or an abuse of discretion, and not supported by the evidence.'" *Id.* (quoting *Foggy Bottom Ass'n, supra,* 639 A.2d at 584) (internal quotation marks and other citation omitted).

■■■ Our review of an agency's legal determinations is *de novo,* but "we will accord deference to an agency's interpretation of the statute which it is responsible for administering if it 'is reasonable and not plainly wrong or inconsistent with its legislative purpose.'" *Id.* (quoting *District*

of Columbia Pres. League v. District of Columbia Dep't of Consumer & Regulatory Affairs, 711 A.2d 1273, 1275 (D.C.1998)) (internal quotation mark and other citations omitted). "When the construction of an administrative regulation rather than a statute is in issue, deference is even more clearly in order." *Foggy Bottom Ass'n v. District of Columbia Zoning Comm'n* [*hereinafter Foggy Bottom Ass'n II*], 979 A.2d 1160, 1167 (D.C.2009) (quoting *1330 Connecticut Ave., Inc. v. District of Columbia Zoning Comm'n*, 669 A.2d 708, 714–15 (D.C.1995)) (internal quotation marks and other citation omitted). However, we have noted that "the question whether the Commission has exceeded its authority under the statute is 'largely unrelated to the agency's expertise,'" and thus is not afforded the same level of deference as "those portions of the statute directly related to the expertise of the agency involved." *Blagden Alley Ass'n v. District of Columbia Zoning Comm'n*, 590 A.2d 139, 142 n. 6 (D.C.1991) (quoting *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 844, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)) (internal quotation marks omitted).

### The Commission's Authority

■ With this standard of review in mind, we address Petitioners' first argument that the Commission was required to refer the case to the BZA because the Commission lacked the authority to proceed as it did. In particular, petitioners rely on the MW Overlay restrictions outlined in 11 DCMR § 1308 to support their argument. The purpose of the overlay is in part "to provide for public review of large developments ... so as to ensure compatibility with and enhancement of the primary neighborhood retail function of the commercial area...." 11 DCMR § 1308.2. Accordingly, the regulation states:

Within the MW Overlay District, on a lot that has ten thousand square feet ... or more in land area, construction of a new building or enlargement of the gross floor area of an existing building by fifty percent (50%) or more, shall be permitted, subject to review and approval as a special exception by the Board of Zoning Adjustment....

11 DCMR § 1308.3. Petitioners' challenge thus raises an issue of first impression for this court: whether the Commission had the authority to approve a PUD and a related Zoning Map Amendment simultaneously to conditionally remove property from a commercial overlay without prior BZA approval where such approval would otherwise be required.

We hold that the Commission had the authority to approve the PUD and related Zoning Map amendment, without the BZA's prior approval pursuant to 11 DCMR § 1308.3 of the MW Overlay District. While Petitioners focus on the MW Overlay regulations to support their contention, we start with the Zoning Commission's enabling statute to hold that its broad authority permitted it to proceed as it did. *See District of Columbia v. Brookstowne Cmty. Dev. Co.*, 987 A.2d 442, 449 (D.C.2010) ("Agencies are creatures of statute and their authority and discretion are limited to that which is granted under their founding statutes."). D.C.Code § 6–621.01(e) (2001) established the Commission to "exercise all the powers and perform all the duties with respect to zoning in the District as provided by law." In particular, the Commission was created "[t]o protect the public health, secure the public safety, and to protect property in · the District of Columbia...." D.C.Code § 6–621.01(a); *see also* D.C.Code § 6–641.01. As such, the Commission is:

empowered, in accordance with the conditions and procedures specified in this

subchapter, to regulate the location, height, bulk, number of stories and size of buildings and other structures, the percentage of lot which may be occupied, the sizes of yards, courts, and other open spaces, the density of population, and the uses of buildings, structures, and land for trade, industry, residence, recreation, public activities, or other purposes; and for the purpose of such regulation said Commission may divide the District of Columbia into districts or zones of such number, shape, and area as said Zoning Commission may determine, and within such districts may regulate the erection, construction, reconstruction, alteration, conversion, maintenance, and uses of buildings and structures and the uses of land.

D.C.Code § 6–641.01; *see also Foggy Bottom Ass'n II, supra,* 979 A.2d at 1167 ("[T]he Zoning Commission is the exclusive agency vested with the power to enact zoning regulations in the District of Columbia." (alteration in original) (quoting *Spring Valley Wesley Heights Citizens Ass'n v. District of Columbia Bd. of Zoning Adjustment,* 644 A.2d 434, 436 (D.C. 1994)) (internal quotation marks and other citations omitted)). In addition, the purpose of the zoning regulations is as follows:

Zoning maps and regulations, and amendments thereto, shall not be inconsistent with the comprehensive plan for the national capital, and zoning regulations shall be designed to lessen congestion in the street, to secure safety from fire, panic, and other dangers, to promote health and the general welfare, to provide adequate light and air, to prevent the undue concentration of population and the overcrowding of land, and

to promote such distribution of population and of the uses of land as would tend to create conditions favorable to health, safety, transportation, prosperity, protection of property, civic activity, and recreational, educational, and cultural opportunities, and as would tend to further economy and efficiency in the supply of public services. Such regulations shall be made with reasonable consideration, among other things, of the character of the respective districts and their suitability for the uses provided in the regulations, and with a view to encouraging stability of districts and of land values therein.

D.C.Code § 6–641.02.

We have deemed "these statutes [D.C.Code §§ 6–641.01 and 641.02] as granting 'the Commission a broad general authority' over zoning matters." *Blagden Alley Ass'n, supra,* 590 A.2d at 142 (quoting *Dupont Circle Citizens Ass'n v. District of Columbia Zoning Comm'n,* 355 A.2d 550, 556 (D.C.1976)).[9] Thus, even in "the absence of any explicit delegation of authority from the [ ] Council [of the District of Columbia]," we have upheld the Commission's decisions when "[n]othing in the broad language of the enabling statute ... would" preclude us from doing so. *Id.* at 142, 143; *see also Dupont Circle Citizens Ass'n, supra,* 355 A.2d at 556. Here, although the enabling statute did not provide the Zoning Commission with the express authority to approve a PUD and a related Zoning Map Amendment, thereby removing property from a commercial overlay without BZA approval, we cannot say that it was precluded from doing so, as it acted "[t]o promote the health, safety, morals, convenience, order, prosperity, or general welfare of the District of Columbia

9. At the time we decided *Blagden Alley Ass'n,* these statutes were codified as D.C.Code §§ 5–413 and 5–414 (1988).

and its planning and orderly development as the national capital. . . ." *See* D.C.Code § 6–641.01; *see also Dupont Circle Citizens Ass'n, supra,* 355 A.2d at 557. Moreover, it had broad authority under D.C.Code § 6–641.02 to enact Zoning Map amendments, taking into "reasonable consideration . . . the character of the [ ] district[ ] and [its] suitability for the uses provided in the regulations. . . ."

This broad general statutory authority is consistent with the flexibility inherent in the PUD-specific regulatory scheme. "[T]he PUD scheme is to be used as a tool of land use development which supports the objective of the community by permitting the development of large areas as a unit." *Watergate E. Comm. Against Hotel Conversion to Co-op Apartments v. District of Columbia Zoning Comm'n,* 953 A.2d 1036, 1040 (D.C.2008) (alteration in original) (quoting *Dupont Circle Citizens Ass'n. v. District of Columbia Zoning Comm'n,* 426 A.2d 327, 332 (D.C.1981) [*hereinafter Dupont Circle Citizens Ass'n II* ] ) (internal quotation marks omitted). Under the regulatory scheme, the Commission is entrusted with reviewing and approving PUD applications. *See* 11 DCMR §§ 2400–2410. "The planned unit development (PUD) process is designed to encourage high quality developments that provide public benefits." 11 DCMR § 2400.1. "The overall goal is to permit flexibility of development and other incentives, such as increased building height and density; provided, that the project offers a commendable number or quality of public benefits and that it protects and advances the public health, safety, welfare, and convenience," but "the PUD process shall not be used to circumvent the intent and purposes of the Zoning Regulations, nor to result in action that is inconsistent with the Comprehensive Plan." 11 DCMR §§ 2400.2, 2400.4.

Furthermore, "[w]e have found nothing in the Zoning Regulations that prohibits the use of PUDs in conjunction with" approval of a Zoning Map amendment to conditionally remove property from a commercial overlay without BZA approval. *See Foggy Bottom Ass'n II, supra,* 979 A.2d at 1169. Instead, given that the Commission is the exclusive entity charged with reviewing and approving PUD applications, we are comfortable with the Commission's interpretation of its authority; 11 DCMR § 2406.2 explicitly permits "[a] PUD application [to] be filed in conjunction with a change in zoning for the property involved," without reference to whether an overlay exists on the property. *See also* 11 DCMR § 2407.9 ("The Commission's first-stage approval shall set forth the appropriate zoning classification to apply to the project, and shall state in detail the elements, guidelines, and conditions that shall be followed by the applicant in the second-stage application."); 11 DCMR § 2408.15 ("A change of zoning approved in conjunction with a PUD shall not .become effective until the covenant required in § 2409.3 has been recorded."). Indeed, Petitioners cite no case law to support the notion that overlay zones should be treated differently from other zoning restrictions. Rather, we have upheld the Commission's exercise of authority to remove a neighborhood commercial overlay district through a PUD-related map amendment in other contexts. In *Foggy Bottom Ass'n II,* this court upheld the Commission's approval of a PUD application that also requested rezoning of "specific inner-campus properties" owned by George Washington University from residential to commercial. 979 A.2d at 1168–70. In doing so, we pointed out that certain overlay districts "impose express limitations on the degree of flexibility that can be permitted through the use of PUDs in [those] districts, demonstrating that the Commission knows how

to restrict PUDs when it chooses to do so." *Id.* at 1169 (footnote omitted). However, notably absent from the MW Overlay regulations are any specific limitations on the use of PUDs. *See* 11 DCMR § 1308; *see also* 11 DCMR §§ 105, 3104. Thus, we agree with the Commission that, contrary to Petitioners' contention, overlay zones do not necessarily contain "unique protections" requiring Zoning Map amendments to be considered in separate proceedings rather than in conjunction with a PUD application.

Moreover, because the Commission conditionally rezoned the property to remove the MW Overlay for the purposes of the PUD, resulting in less restrictive height and density restrictions under the PUD guidelines, it did not err by failing to enforce the overlay's restrictions. Petitioners contend that the Commission believed that "the Overlay regulations applied to Giant's property while the Commission was considering the PUD and w[ould] continue to apply to the property until the PUD covenant is filed." Thus, Petitioners claim that the Commission concedes a key argument because its brief contradicts Giant's claim that the overlay regulations' procedural-review requirements did not apply to Giant's application.[10] However, contrary to Petitioners' assertion, there is no inherent contradiction between the statements of the Commission and Giant. The Commission stated in its July 13, 2009 Order approving Giant's PUD application and Zoning Map amendment that by approving the application, it had "exercised its authority to remove a neighborhood commercial overlay district through a PUD-related map amendment." The Commission also stated in both its Order and its brief that "[a] PUD-related map amendment is a conditional change to existing zoning that does not begin until a PUD covenant is recorded, expires if the PUD is not built, and ends once the PUD use terminates." Thus, as the Commission's Order and brief explain, the MW Overlay *was* removed through the Commission's approval of a PUD-related map amendment pursuant to its authority, but the removal is a "conditional change" and not a permanent map amendment. The Commission's interpretation of its authority is consistent with our interpretation of the PUD application process in *Dupont Circle Citizens Ass'n II, supra,* where we stated that "[s]ince the PUD use is conditioned on the rezoning application being granted, if the rezoning should fall, then the PUD must fall[,]" 426 A.2d at 336, and "[t]he height of the new building will not need an exception to the zoning regulations because it will be within the limits designated by the new zone[,]" *id.* at 335. Thus, the Commission's approval of a PUD-related Zoning Map amendment temporarily and conditionally removed the MW Overlay, and therefore the overlay's restrictions did not apply to the property.

▆ Finally, the Commission was not required to refer the project to the BZA for special exception review because it did not rely on its special exception authority. Petitioners misconstrue the Commission's argument regarding special exceptions. Petitioners claim that the Commission concedes that "it did *not* employ Section

---

10. Petitioners misconstrue Giant's argument by rephrasing it as an assertion that the overlay regulations' procedural-review requirements "were of no force and effect while the Commission was considering Giant's proposal." Giant makes no such assertion. Rather, Giant argues that the Commission was "in no way bound by any requirements of the Overlay in its consideration of the PUD and the related map amendment" because "the Commission had the clear authority to approve the related map amendment and remove the Overlay."

2405.7 to stand in the BZA's shoes" when it states that "[r]egardless of the Commission's belief that it could have conducted the special exception review required by the Overlay regulations, it did not do so." However, the Commission's argument is not that it failed to conduct special exception review under 11 DCMR § 2405.7; rather, it claims that it "could have" approved the map amendment through such a review, but it did not need to do so. As Petitioners point out, 11 DCMR § 1308.3 states that "[w]ithin the MW Overlay District ... construction of a new building or enlargement of the gross floor area of an existing building by fifty percent (50%) or more, shall be permitted, subject to review and approval as a special exception by the Board of Zoning Adjustment...." But, under 11 DCMR § 2405.7, the Commission has "the option to approve any use that is permitted as a special exception and that would otherwise require the approval of the Board of Zoning Adjustment[,]" and thus "[a]pproval of the Board shall not be required" under 11 DCMR § 2405.8. Thus, the Commission argues that pursuant to 11 DCMR § 2405.8, it can approve any use that would otherwise require BZA approval under 11 DCMR § 1308.3. The Commission concedes that it did not rely on its authority under Section 2405.7 in approving Giant's PUD-related map amendment application, but it does not concede, as Petitioners imply, that it was *required* to rely on its authority under Section 2405.7. As noted above, the Commission approved Giant's application through its broad authority to grant a Zoning Map amendment in conjunction with a PUD application and therefore, the Commission conditionally rezoned the relevant area. Petitioners also conceded that because the Commission did not approve Giant's application pursuant to its authority to grant special exceptions, the scope of the Commission's authority to grant special exceptions need not be considered by this court. In conclusion, Petitioners "simply ha[ve] not demonstrated that the Commission's interpretation of its own regulations 'is unreasonable or in contravention of [their] language or legislative history,'" and thus we affirm the Commission's interpretation. *See Foggy Bottom II, supra,* 979 A.2d at 1170 (alteration in original) (quoting *Watergate E. Comm., supra,* 953 A.2d at 1043).[11]

### Inconsistency With the Comprehensive Plan

We next address Petitioners' argument that the Commission's approval of Giant's PUD application was inconsistent with the Comprehensive Plan. Specifically, Petitioners contend that the Commission's decision

11. The Commission also contends that 11 DCMR § 1308 merely "limits the Zoning Administration's authority to issue building permits within the Overlay," as opposed to limiting the Commission's authority to review and approve PUD applications. The Commission asserts that the special exception review regulations "do not apply to any property within the Overlay until an affected owner files an application with [the Department of Consumer and Regulatory Affairs] seeking 'permission' to begin 'construction' under § 3108.3." As Petitioners insist, this argument is raised by the Commission for the first time on appeal. "Absent a showing of 'exceptional circumstances' in the 'interests of justice,' we cannot consider arguments 'not presented before the administrative agency at the appropriate time.'" *Badawi v. Hawk One Sec., Inc.,* 21 A.3d 607, 613 n. 4 (D.C.2011) (quoting *Goodman v. District of Columbia Rental Hous. Comm'n,* 573 A.2d 1293, 1301 (D.C.1990)) (internal citations omitted). Furthermore, because we hold that the Commission's interpretation of its authority to approve Giant's PUD application and Zoning Map amendment simultaneously was not in error, we need not reach the issue of whether the special exception review requirements applied to Giant prior to the company applying for a building permit.

to rezone the MW District to the C–2–A Zoning District is inconsistent with the Plan. Petitioners claim that "Giant's collection of Plan provisions ... cannot support affirmance because (i) most were not part of the Commission's C–2–A analysis; (ii) even if they had been, the Commission did not explain how they differ from their 1989 counterparts; and (iii) some provisions to which Giant points actually cut *against* the Commission's conclusion." In addition, Petitioners argue that Giant's proposal is inconsistent with the Plan because the proposed apartment building is neither "low density" nor "commercial." We disagree with Petitioners and conclude that the Commission's approval of Giant's PUD application was not inconsistent with the Plan.

■ "The Commission may not approve the [PUD] application unless it finds that the 'proposed PUD is not inconsistent with the Comprehensive Plan and with other adopted public policies and active programs related to the subject site.'" *Watergate E. Comm., supra,* 953 A.2d at 1051 (quoting 11 DCMR § 2403.4). The Plan "is a broad framework intended to guide the future land use planning decisions for the District." *Tenley & Cleveland Park Emergency Comm. v. District of Columbia Bd. of Zoning Adjustment,* 550 A.2d 331, 337 (D.C.1988). The Plan has several purposes, including "[d]efin[ing] the requirements and aspirations of District residents, and accordingly influenc[ing] social, economic and physical development" and "[a]ssist[ing] in the conservation, stabilization, and improvement of each neighborhood and community in the District." D.C.Code § 1–306.01(b)(1), (6) (2001).

■ As a threshold matter, Petitioners claim that "the Commission reversed itself on the C–2–A zoning's consistency with the Plan, even though neither the C–2–A category nor the Plan's vision for the MW District ha[d] changed," because "[i]t [previously] found that C–2–A was 'to a degree inconsistent' with the [1989] Plan." Thus, it "had to offer a sound reason for this about-face and did not." However, Petitioners fail to recognize that the 1989 Plan was supplemented by the 2006 Comprehensive Plan's Future Land Use Map designation, as "[t]he Future Land Use Map is part of the adopted Comprehensive Plan and carries the same legal weight as the Plan document itself." 10–A DCMR § 225.1. Under the Future Land Use Map, the C–2–A Zoning district can be designated "Low Density Commercial" and "Moderate Density Commercial." 10–A DCMR §§ 225.8, 225.9. Both Low Density Commercial and Moderate Density Commercial Zoning districts "define shopping and service areas," with "[r]etail, office, and service businesses" as "the predominant uses," but Moderate Density Commercial is "somewhat more intense in scale and character...." 10–A DCMR §§ 225.8, 225.9. Under the Moderate Density Commercial designation, "[b]uildings are larger and/or taller than those in low density commercial areas [which are generally one-to three-story commercial buildings] but generally do not exceed five stories in height." 10–A DCMR § 225.9. These designations are consistent with how the C–2–A Zoning District is defined elsewhere in the regulations. The C–2–A Zone District is "located in low and medium density residential areas with access to main highways or rapid transit stops, and shall include office employment centers, shopping centers, and medium-bulk mixed use centers." 11 DCMR § 720.3. As such, the C–2–A Zone District "is designed to provide facilities for shopping and business needs, housing, and mixed uses for large segments of the District of Columbia outside of the central core." 11 DCMR § 720.2. Thus, we examine the Commission's find-

ings with respect to the C–2–A rezoning to determine whether it erred in concluding that the proposed PUD was not inconsistent with the Plan.

Here, unlike the Commission's Order in *Blagden Alley Ass'n,* the Order at issue did not merely contain "a bare conclusion that the proposed rezoning for the P.U.D. is not inconsistent with the Comprehensive Plan"; rather, the Commission's order is replete with references as to how the rezoning to C–2–A was not inconsistent with the Comprehensive Plan. *See* 590 A.2d at 147. The Commission credited the testimony of Giant and the OP regarding the property's designations as "Low Density Commercial" and "Low Density Residential" on the Future Land Use Map. The Commission found that the commercial area "will continue to be primarily two- and threestory buildings." Moreover, the Commission noted that the PUD-related Zoning Map amendment does not exceed the maximum height and density permitted under PUD guidelines for the C–2–A zone district. The Commission concluded that "[t]he proposed C–2–A zoning of the PUD is not inconsistent with the 2006 Comprehensive Plan's Future Land Use Map designation, given the language in the Plan and description of the C–2–A Zone District in the Regulations as intended to serve 'low and medium density residential areas.' "

Furthermore, the Commission addressed whether the PUD was consistent with the Plan by comparing it to all the elements of the Plan. The Commission credited the testimony of Giant and OP that the project is consistent with the Plan's major elements, "including the Housing, Transportation, Urban Design, and Economic Development elements." In particular, it gave "greater weight" to the Land Use Element per 10–A DCMR § 300.3, as the bulk of its findings regard-

ing the Plan's major elements centered around the Land Use Element, and it found that the "[p]roperty is appropriate for denser redevelopment as a pedestrian-oriented commercial node along the Wisconsin Avenue corridor." The Commission further found that the PUD "will further many of the objectives of the MW Overlay, including the promotion of neighborhood-serving retail and service uses, removal of curb cuts along Wisconsin Avenue, and limitations on financing and eating establishments." Petitioners do not dispute these findings, all of which support the Commission's determination. As such, the Commission "explain[ed] how the rezoning required by this P.U.D. application is not inconsistent with the Comprehensive Plan *as a whole.*" *Id.*

Moreover, Petitioners' argument that Giant's proposal is inconsistent with the Plan because the proposed apartment building is neither "low density" nor "commercial" is unpersuasive. The Commission explicitly rejected Petitioners' argument "that the absence of a mixed-use designation on the Future Land Use map precludes mixed-use development," as the text of the Plan is clear that "housing is permitted in all commercial areas. . . ." Additionally, the Commission noted that the Plan states that "housing is explicitly permitted in the commercial land use categories, and permits height and density beyond the typical range of one to three stories through the use of the PUD process." The Commission noted that the Plan describes the Low–Density Commercial category "as primarily one-to-three story buildings, with retail, office, and service businesses as the predominant use," but notes that the Plan does not require that each block "strictly correspond with the general description." These findings are consistent with the regulations outlining C–2–A zoning restrictions noted above. They also comport with the "Guidelines for

Using the Generalized Policy Map and the Future Land Use Map," which state that "[t]he Future Land Use Map is not a zoning map[,] [ ]as zoning maps are parcel-specific.... By definition, the [Future Land Use] Map is to be interpreted broadly." 10–A DCMR § 226.1(a). Thus, we conclude that there is substantial evidence in the record supporting the Commission's determination that the PUD is not inconsistent with the Plan. *Hotel Tabard Inn, supra*, 747 A.2d at 1174.

### The Commission's Findings Regarding Giant's Truck–Loading Operation

■ Finally, we address Petitioners' argument that the Commission's conclusion regarding Idaho Avenue truck traffic is unsupported by substantial evidence. In particular, Petitioners claim that the evidence is insufficient to support the Commission's finding that "Idaho Avenue can accommodate two-way traffic," because "there was clear record evidence that the avenue could *not* accommodate two-way truck traffic—namely, DDOT's own report, concluding that truck traffic on streets of similar width would create 'undue conflicts.' " We disagree and conclude that the Commission's findings regarding Giant's truck-loading operation on Idaho Avenue are supported by substantial evidence in the record.

Here, DDOT conducted an independent review of the truck-loading operation at issue. In addition to providing comments on February 12, 2009 and April 3, 2009, DDOT also submitted supplemental comments on April 22, 2009, and found that the Idaho Avenue and Macomb Street truck unloading berths can accommodate the truck deliveries for all retail. Further, DDOT specifically addressed the loading operation on Idaho Avenue, and stated that it was more appropriate than Macomb Street because (1) "[t]ruck turn radii at the intersection leading to Idaho Avenue loading docks allow for safer turn movements," and (2) "[c]urrently, Idaho Avenue does not have other commercial establishments that require significant unloading." In its findings, the Commission stated that it credited the testimony of Giant and DDOT "that Idaho Avenue can accommodate two-way traffic, including truck traffic, that such use of local streets for truck deliveries is not uncommon in an urban setting, and that the Applicant's proposed modification ... will adequately accommodate truck turn movements."

■ The Commission also found that the dock was designed to minimize its impact through installation of a 20–foot sound wall, a berm and trees to provide visual and noise buffering. Further, Giant modified the design twice in response to community demands by moving the location of the entrance to the loading dock further away from residential property and angling the loading entrance and proposed truck routing. Based on the record, there is substantial evidence to support the Commission's conclusion that the grocery store's truck loading operation will not impose adverse impacts and that Idaho Avenue can accommodate the loading operations. *Hotel Tabard Inn, supra*, 747 A.2d at 1174.[12]

12. We note that we are unpersuaded by Petitioners' contention that the Commission's conclusion is unsupported by substantial evidence because DDOT's own report concluded "that truck traffic on streets of similar width would create 'undue conflicts.' " It is true that in our review of the record, we must consider evidence that runs counter to the evidence upon which the agency relies. *Sandula v. District of Columbia Police & Firefighters' Ret. & Relief Bd.*, 979 A.2d 32, 39 (D.C.2009). However, based on our review of the record in the present case, we cannot say that any inconsistency in the evidence based on DDOT's own report justifies a different result. In particular, we note that the Commission

For the foregoing reasons, we affirm the Commission's order.

*So ordered.*

did not accept the opinion of PSI, 3300 Idaho Neighbors' expert in the field of traffic engineering. The Commission noted that "PSI primarily challenged [Giant's] truck generation rate and the ability of the proposed number of loading berths to accommodate truck deliveries...." PSI's opinion included "a number of ... observations regarding the use of Idaho Avenue for truck traffic and the impact of truck traffic on Idaho Avenue." The Commission further found "that the scale and location of the primary loading area for the grocery store, located on the South Parcel on Idaho Avenue, is not unacceptable." In reaching this finding, the Commission credited the testimony of OP to "find[] that Idaho Avenue southwest of its intersection with Newark Street currently lacks a residential character notwithstanding its residential zoning designation...." The Commission also credited Giant's testimony "that it is infeasible to locate the loading docks further to the north because of operational and physical constraints," and further credited its testimony "regarding the estimated number of trucks that will serve the grocery store at this location...." Thus, we are satisfied "that the agency has given full and reasoned consideration to all material facts and issues." *Id.* at 40. (quoting *Georgetown Univ. Hosp. v. District of Columbia Dep't of Emp't Servs.*, 916 A.2d 149, 151 (D.C.2007)) (internal quotation mark and other citations omitted).